**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| ) | |
| IOVATE HEALTH SCIENCES, INC.,                    ) | |
| UNIVERSITY OF FLORIDA RESEARCH   ) | |
| FOUNDATION, INC. and FLAMMA SpA,  ) | |
| ) | |
| Plaintiffs,                          ) | |
| )   Civil Action No. 9:07-CV-46 | |
| v.                                ) | |
| )      JUDGE RON CLARK | |
| BIO-ENGINEERED SUPPLEMENTS &       ) | |
| NUTRITION, INC., d/b/a BSN, INC.,           ) | |
| and MEDICAL RESEARCH INSTITUTE,   ) | |
| ) | |
| Defendants.                        ) | |
| ) | |

## BSN'S MOTION FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE '199 AND '287 PATENTS ARE INVALID

Executive Summary ...................................................................................................1

Issues Presented ......................................................................................................1

Statement of Undisputed Material Facts .................................................................2

   A) The ʼ199 Patent – Claim 1 ..............................................................................2

   B) The ʼ199 Patent – The Berge Reference...........................................................2

   C) The ʼ199 Patent – The Almada Reference........................................................4

   D) The ʼ199 Patent -- the 1920ʼs Literature .........................................................5

   E) The ʼ287 Patent ...............................................................................................6

ARGUMENT ............................................................................................................8

A. Summary Judgment Is Appropriate for the ʼ199 Patent Because There Is No Genuine Issue of Material Fact Regarding Invalidity Under 35 U.S.C. § 103.................................8

  1. The Berge Reference, Not Considered During Examination, Clearly Renders Claim 1 of the ʼ199 Patent Obvious. ..........................................................................................9

  2. The Examinerʼs Rejection Over Almada in View of Wittman Was Proper and Would Not Have Been Removed Had the Berge Reference Been Presented...........................12

B. The ʼ287 Patent Is Anticipated or Rendered Obvious By the Use of Amino Acid-Ketoacid Supplements Disclosed in Fitness Periodicals Published Years Before the Earliest Possible Effective Filing Date of the Patent. .....................................................14

   1. The June 1995 Advertisement for TwinLab Mass Fuel .......................................16

   2. The June 1996 Advertisement in Flex Magazine for Weider Professional Protein. .................................................................................................................................18

   3. The January 1995 Flex Magazine Advertisements for National Health Products ʻHot Stuff Double Xʼ. .........................................................................................................19

   4. The February 1994 Advertisement in Flex Magazine for TwinLab Anti-Catabolic Fuel and the November 1993 Advertisement in Flex Magazine for Weider Performance OKG. ..........................................................................................................................20

   5. The Di Pasquale Reference (ʻThe Anabolic Dietʼ)...............................................21

   6. Claims 10 and 12 of the ʼ287 Patent Are Invalid As Obvious Because the Administration of Ornithine Alpha-Ketoglutarate (or Any Other Compound Disclosed in the Above References and Claimed in the ʼ287 Patent) In a Low-Calorie Beverage or In Capsule Form Was Well Known as of November 13, 1996. ............23

   7. The Asserted Claims of the ʼ287 Patent Are Invalid As Obvious Because The Prior Art Publications Suggest the Use of the Claimed Compounds for The Claimed Purposes. .........................................................................................................................23

Conclusion ............................................................................................................24

**Executive Summary**

The two patents-in-suit, U.S. Patent No. 5,973,199 (the ʼ199 patent) and U.S. Patent No. 6,100,287 (the ʼ287 patent) relate to dietary supplements.  The ʼ199 patent claims hydrosoluble salts of creatine formed from four specific acid anions: citrate, maleate, fumarate or malate.  The ʼ287 patent discloses and claims the use of supplements containing an amino acid and a ketoacid to enhance athletic muscle performance or recovery from fatigue.  Because the invention of the ʼ199 patent was clearly obvious in view of the prior art and the invention of the ʼ287 patent had been published and publicly used prior the patentʼs priority date, the patents in suit are invalid.  Defendant Bio-Engineered Supplements & Nutrition, Inc. (ʺBSNʺ) requests that the Court grant summary judgment in this cause as to Plaintiffsʼ claims of patent infringement due to the invalidity of the ʼ199 and ʼ287 patents.

**Issues Presented**

Whether the patents in suit are invalid under 35 U.S.C. §§ 102 and 103 because

a)  The invention of the ʼ199 patent would have been obvious to a person of ordinary skill in the art.  35 U.S.C. § 103.

b)  The invention of the ʼ287 patent was known, published, and publicly used prior to the patentʼs priority date.  35 U.S.C. § 102(a), (b).

c)  To the extent any invention of the ʼ287 patent is not anticipated under 35 U.S.C. § 102, such invention would have been obvious to a person of ordinary skill in the art.  35 U.S.C. § 103.

**Statement of Undisputed Material Facts**
     **A) The '199 Patent – Claim 1**

1.  The inventors of the ʹ199 patent sought to solve the problem of low solubility of
    creatine.  (Exh. A, col. 1, ll. 33-45).[1]

2.  Claim 1 of the ʹ199 patent claims hydrosoluble salts of the formula



3.  Wherein A- represents the anion of citric, maleic, fumaric or malic acid.  (Exh. A,
    col. 2, ll. 41-48).

4.  The international parent application, through which the ʹ199 patent claims an earlier
    filing date, also claimed tartaric acid as one of the anions for the creatine salt.  (Exh.
    B at 4, claim 5).

     **B) The '199 Patent – The Berge Reference**

1.  Creatine supplements became popular in the 1990ʹs among people looking to build
    muscle mass and/or improve athletic performance.  (Hamilton Decl., ¶10).

2.  Historically (and as of August 4, 1994, the date the foreign parent application of the
    ʹ199 patent was filed in Italy), the creatine commonly used in such supplements was
    in the form of creatine monohydrate.  Creatine monohydrate does not dissolve well in
    water.  (*Id.*).

---

[1] References herein to the lettered Exhibits A-X are to the Exhibits to the Declaration of William J.
Hallihan, filed concurrently herewith as Exhibit 1.

3. The goal of the inventors of the ʹ199 patent as originally stated in the patentʹs international parent application was to solve the problem of low solubility of creatine in order to make creatine more available to a human subject.  (Exh. B at 1-2; see also Exh. A, col. 1, ll. 33ʹ45).

4. The article "Pharmaceutical Salts" by Stephen M. Berge et al. ("Berge Reference") was published in the Journal of Pharmaceutical Sciences, Vol. 66, No. 1, January 1977.  (Hallihan Decl., ¶ 9; Exh. H).

5. The Berge Reference was not before the Examiner during the prosecution of the ʹ199 patent.  (Exh. A at 1, "References Cited"/"Other Publications").

6. The Berge Reference teaches that salts made with dicarboxylic acids confer greater water solubility than other salts, while salt combinations with monocarboxylic acids are insoluble in water.  (Exh. H at 2, ¶ 4).

7. The creatine salts claimed in the ʹ199 patent are all made with dicarboxylic acids, with the exception of creatine citrate which is a tricarboxylic acid.  (Buynak Decl., ¶¶ 15-16; Exh. N at 91, ll. 7-18).

8. One of ordinary skill in the art would have known at the time of the ʹ199 patentʹs invention that maleic, malic, and fumaric acids were dicarboxylic acids and that citric acid was a tricarboxylic acid.  (Buynak Decl., ¶¶ 19-21).

9. The Berge Reference presents a table ("Table I") of commercially marketed salts approved for use by the United States Food and Drug Administration, listing such salts and their share of the commercial marketplace through 1974.  (Exh. H at 2).

10. Citrate, fumarate, malate, maleate, and tartrate are included in Table I of the Berge Reference.  Table I shows that citrate, maleate and tartrate were in widespread use in the commercial market place.  (Exh. H at 2).

### C)  The '199 Patent – The Almada Reference

1. U.S. Patent No. 5,627,172 to Almada et al. is directed to the use of creatine derivatives for reducing cholesterol.  Useful creatine derivatives are said to include creatine monohydrate as well as õpharmaceutically acceptable creatine salts or complexes such as creatine hydrochloride or creatine complexes with other acids.ö (Exh. I at 1, abstract, col. 3, ll. 52-55).

2. A preferred embodiment of the Almada Reference calls for the creatine derivative to be prepared in powdered form and dissolved in a liquid beverage.  Almada notes that in cold liquid the powdered creatine derivative typically will not completely dissolve. (Exh. I, col. 4, ll. 41-55).

3. During the prosecution history of the ø199 patent, the Examiner rejected claim 1 as invalid as obvious over Almada in view of Wittman.  In response, the inventors submitted evidence of an experiment performed by one of the coinventors (õthe Del Corona Studyö) which allegedly showed that the inventorsø creatine citrate salt when dissolved in water degraded into the substance creatinine less rapidly and to a lesser extent than creatine hydrochloride, a salt named in the Almada reference.  The co-inventor who performed the experiment contended the difference was õstriking, unexpected, [and] beneficial.ö  Based upon this evidence, the Examiner removed the Almada rejection and allowed the patent to issue.  (Exh. C at 2-3; Exh. E at 2-3; Exh. F at 2-4; Exh. G).

4.  In the Del Corona Study, at the time immediately after the dissolution of the salts in water, 99.66% of the creatine was reported as still remaining in the creatine hydrochloride solution compared to 99.91% for the creatine citrate.  An hour after the preparation of the solutions, 99.55% of the creatine was reported as still remaining in the creatine hydrochloride compared to 99.84% for the creatine citrate.  (Exh. F at 3).

**D)  The '199 Patent -- the 1920's Literature**

1.  The article "CXV.  The Creatine-Creatinine Equilibrium.  The Apparent Dissociation Constants of Creatine and Creatinine" by Robert Keith Cannan and Agnes Shore ("Cannan and Shore") was published in Biochemical Journal, Vol. 22, pp. 920-929 (1928) (Hallihan Decl., ¶ 12; Exh. K).

2.  The article "The Equilibrium Between Creatine and Creatinine, In Aqueous Solution.  The Effect of Hydrogen Ion" by Graham Edgar and H.E. Shiver ("Edgar and Shiver"), was published in the Journal of the American Chemical Society, Vol. 47, pp. 1179-1188 (1925).  (Hallihan Decl., ¶ 13; Exh. L).

3.  The article "The Kinetics of the Conversion of Creatine Into Creatinine In Hydrochloric Acid Solutions" by Graham Edgar and R.A. Wakefield ("Edgar and Wakefield") was published in the Journal of the American Chemical Society, Vol. 45, pp. 2242-2245 (1923).  (Hallihan Decl., ¶ 14; Exh. M).

4.  None of the three articles identified above in this section were before the Examiner during the prosecution of the '199 patent.  (Exh. A at 1, "References Cited"/"Other Publications").

5.  Cannan and Shore reported a series of experiments comparing creatine degradation at different pH levels over time, all performed at 30 degrees Celsius.  At the 25 hour point, degradation to creatinine ranged from approximately 1% to a maximum of

approximately 7% (the maximum occurring at circa 3.0 pH).  (Buynak Decl., ¶ 28-29; Exh. K at 924-26).

### E)  The '287 Patent

1.  The '287 patent claims the method of administering a composition comprised of amino acids and ketoacids (of differing specificity) to enhance muscle performance or recovery from fatigue.  (Exh. P, col. 16, l. 60 ó col. 18, l. 20).

2.  Flex Magazine is a periodical directed to bodybuilders and other athletes.  The magazine is published on a monthly basis, and features advertisements for nutritional dietary supplements for use in enhancing muscle performance and/or improving recovery from fatigue.  (Earnest Decl., ¶ 15, Exh. Q through U).

3.  The June 1995 issue of Flex Magazine includes an advertisement for a nutritional supplement named õTwinLab Mass Fuelö which teaches use of the supplement for improving muscle performance and recovery from fatigue. The supplement is said to contain the ingredients L-Ornithine Alpha-ketoglutarate, Ketoisocaproate acid, L-Glutamine, and L-Carnitine.  (Earnest Decl., ¶ 16; Exh. Q at 107).

4.  The June 1996 issue of Flex Magazine includes an advertisement for a nutritional supplement named õWeider Professional Proteinö which teaches use of the supplement for improving muscle performance and recovery from fatigue. The supplement is said to contain the ingredients Arginine Asparate, Ornithine Alpha-ketoglutarate, Alpha-Ketoisocaproic Acid (KIC), Glutamine, and Carnosine.  (Earnest Decl., ¶ 26; Exh. R at 138-140).

5.  The January 1995 issue of Flex Magazine includes an advertisement for a nutritional supplement named õNational Health Products Hot Stuff Double Xö which teaches use of the supplement for improving muscle performance and recovery from fatigue.  The

supplement is said to contain the ingredients OKG, arginine pyroglutamate, and creatine.  (Earnest Decl., ¶ 34; Exh. S at 213-214)

6. The February 1994 issue of Flex Magazine includes an advertisement for a nutritional supplement named õTwinLab Anti-Catabolic Fuelö (as well as other supplements) and teaches use of the supplement for improving muscle performance and recovery from fatigue.  The supplement is in capsule form and said to contain the ingredients L-Ornithine Alpha-ketoglutarate, Ketoisocaproate and L-Glutamine.  (Earnest Decl., ¶ 39; Exh. T).

7. The November 1993 issue of Flex Magazine includes two advertisements for a nutritional supplement named õWeider Performance OKGö which teaches use of the supplement for improving muscle performance and recovery from fatigue. The supplement is in capsule form and said to contain the ingredients L-Ornithine Alpha-ketoglutarate.  (Earnest Decl., ¶ 44; Exh. U at 84-85, 176).

8. The book õThe Anabolic Dietö was written by Dr. Mauro Di Pasquale and published in 1995.  In õThe Anabolic Dietö the author recommends a number of õformulasö to be taken by an athlete before, during, or after workouts for the purpose of improving muscle performance and recovery from fatigue.  õFormula 1ö is recommended to be prepared in water and is said to include the ingredients OKG (ornithine alpha-ketoglutarate), KIC (ketoisocaproate), glutamine and leucine.  õFormula 3ö is said to contain the ingredients KIC, OKG, arginine and glutamine (as well as other ingredients).  (Earnest Decl., ¶¶ 50-51 and 53-56; Exh. V at 56-59).

9. Arginine and Ornithine are each amino acids which can be cationic or dibasic. (Earnest Decl., ¶ 11).

10. Alpha-ketoglutarate is a ketoacid.  (Earnest Decl., ¶ 12).

11. Ornithine Alpha-ketoglutarate is an amino acid conjugated with a ketoacid.  (Earnest Decl., ¶ 13).

12. Glutamine is an amino acid.  (Earnest Decl., ¶ 11).

13. Ketoisocaproic Acid (KIC)/ketoisocaproate is a ketoacid. (Earnest Decl., ¶ 12).

14. Strength is a measure of muscle performance.  (Earnest Decl., ¶¶ 14, 35, 55; Exh. P, col. 16, ll. 1-4).

15. Increasing muscle mass enhances muscle performance. (Earnest Decl., ¶ 22).

16. Preventing breakdown in muscle tissue that would otherwise occur enhances muscle performance and recovery from fatigue.  (Earnest Decl., ¶ 51).

17. It was known at the time of the invention by those of ordinary skill in the art that nutritional dietary supplements of the type claimed in the '287 patent could be prepared in capsule form.  (Earnest Decl., ¶ 57).

18. It was known at the time of the invention by those of ordinary skill in the art that nutritional dietary supplements of the type claimed in the '287 patent could be prepared in low calorie solutions.  (Earnest Decl., ¶¶ 43, 49, 56, 58).

**Argument**

**A.  Summary Judgment Is Appropriate for the '199 Patent Because There Is No Genuine Issue of Material Fact Regarding Invalidity Under 35 U.S.C. § 103.**

The granting of summary judgment of invalidity is appropriate under 35 U.S.C. § 103.  *See Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000). A patent claim is invalid if the subject matter of the claim would have been obvious at the time of the invention in view of the prior art to one of ordinary skill in the art.  *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).  "The combination of familiar elements with

known methods is obvious when it provides no functionality except for yielding predictable results.ö *AdvanceMe, Inc. v. RapidPay, LLC*, 509 F.Supp.2d 593, 610 (E.D. Tex. 2007).

### 1.   The Berge Reference, Not Considered During Examination, Clearly Renders Claim 1 of the '199 Patent Obvious.

The inventors of the ø199 patent sought to increase the solubility of a long-known compound: creatine.  The Berge reference is so clear as to how to accomplish this goal that a layman with a good chemical dictionary could have applied it and quickly identified the salts claimed in the ø199 patent.

In a section titled öPotentially Useful Salts,ö the Berge Reference states:

> ö**Knowledge that one salt form imparts greater water solubility...would greatly benefit chemists and formulators**....[I]n general**,** salt combinations with monocarboxylic acids are insoluble in water and lend themselves to repository preparations, **while those of dicarboxylic acids confer water solubility if one carboxylic group is left free.**ö

(Exh. H at 2 (emphasis added).

As was discussed during the claim construction briefing and at the March 5, 2008 claim construction hearing, malic acid, maleic acid, and fumaric acid are known to be dicarboxylic acids, while citric acid is a tricarboxylic acid.  (Buynak Decl., ¶ 15-16; Exh. N at 91, ll. 7-18).[2]  Tartaric acid, which was additionally claimed as an acid anion in the ø199 patentøs parent foreign application, was also a known dicarboxylic acid.  (Buynak Decl., ¶. 16).

Leaving nothing to doubt, the Berge reference also provides a table of commercially marketed salts approved by the U.S. Food and Drug Administration.  (Exh.

---

[2] For the claimed salts in their 1:1 molar ratio form (e.g., creatine malate, as compared to dicreatine malate), a carboxylic group is left free.  (Buynak Decl., at ¶ 17)   It is undisputed that claim 1 does not include creatine salts in 1:1 molar ratio with the respective anions.

H at 2, Table I).  Each of the acid salt forms claimed by the ø199 patent are listed.  Of the dicarboxylic acids included in the table, maleic acid and tartaric acid were disclosed as being in the most widespread use.  (*Id.*; Buynak Decl., ¶ 21).  Clearly it would be obvious for one of ordinary skill in the art seeking to increase the solubility of creatine to apply the Berge reference to create the dicarboxylic acid salts of creatine claimed in the ø199 patent.  (Buynak Decl., ¶ 25).

Against this unambiguous record of obviousness, Plaintiffs may attempt to invoke the õteaching awayö argument which was unsuccessfully argued to the Examiner during prosecution in response to the rejection for obviousness based on the Almada reference (discussed *infra* at subsection 2).  Specifically, Plaintiffs may argue that prior to their invention, the inert substance creatinine was present in all creatine acid salts (both for salts formed with strong mineral acids, such as creatine hydrochloride, and for salts formed with weaker organic acids such as the ones claimed in the ø199 patent).  The inventors alleged during prosecution that the lack of sufficient creatine in these impure salts, as well as the degree of creatine degradation that occurs when the salts are dissolved in water, made any creatine acid salts suggested by the prior art unsuited for the purpose stated in the application, i.e., providing a therapeutic dose of creatine to a human subject at necessary concentrations.  (Exh. D at 4-6).[3]

The record refutes such a contention.  As this Court is aware, claim 1 has been construed as requiring a level of purity only such that õthe salt of creatine is present in a concentration chosen by the person preparing the salt.ö (Exh. O at 9).  There is no evidence that the õtraditionalö methods of preparing creatine salts decried by the

---

[3] The '199 patent states that for the purposes described one would seek to administer doses of 5-10 grams of creatine.  (Exh. A, col. 1, ll. 38-39).

inventors during prosecution of the ʹ199 patent resulted in more than trivial amounts of creatinine in the salts, let alone degraded the creatine to the extent that the salts could not be used to deliver the doses of creatine in question, *especially* in light of the gains in providing creatine to the subject that would be achieved from increasing solubility of the creatine.  In fact, the record shows just the opposite.  (Buynak Decl., ¶ 27-32).  For example, the Cannan and Shore reference discloses that in a 25 hour period, one would expect, at worst, a loss of 7% of the creatine to creatinine when in solution with an acid. (Buynak Decl., 28-29; Exh. K at 924-26).[4]

In actuality, salification of creatine with organic acids occurs well before 25 hours, but this "worst case scenario" shows how untenable any teaching away argument based on creatinine's presence in the salts would be.  (Buynak Decl., ¶ 30).  Even in the fanciful scenario where one of ordinary skill in the art chose to make a salt with a minimum purity of 50% creatine, the increase in solubility of the creatine (reported by the ʹ199 patent to be 300 to 1500% at col. 1, ll. 50-53) would more than make up for any reasonably conceivable loss to creatinine.  A prior art reference only creates a "teaching away" if it suggests a path of development "is unlikely to be productive of the result sought by the applicant."  *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006), *citing In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

---

[4] During prosecution, while the inventors of the ʹ199 patent argued that one would expect creatinine to be formed when making either a mineral acid salt of creatine or an organic acid salt of creatine, nothing was contended (let alone evidence presented) regarding the level of creatinine "impurity" that would be expected, or even which of the two types of creatine acid salts would have been expected to contain more creatinine.  (Exh. D at 4-6).  The Examiner refused to even consider the argument regarding the alleged greater purity of the claimed salts because the inventors had not claimed creatine salts pure of creatinine. (Exh. E at 2).

### 2. The Examiner's Rejection Over Almada in View of Wittman Was Proper and Would Not Have Been Removed Had the Berge Reference Been Presented.

There are several reasons why the ø199 patent should have been rejected as obvious over the Almada patent (U.S. Patent No. 5,627,172, Exh. I).  First, as the Examiner correctly maintained, the Almada patent explicitly teaches the use of a pharmaceutically acceptable salt of creatine.  (Exh. E at 2, *citing* Exh. I (Almada), col. 3, l. 52).  Moreover, the specific pharmaceutical acids named in the ø199 patent were specified in the Wittman reference (U.S. Patent No. 5,489,589) (Exh. C at 3, *citing* Exh. J (Wittman), col. 6, ll. 8-24), clearly creating a prima facie case of obviousness.  The Examiner only removed the rejection upon the declaration of co-inventor Del Corona, who provided results of an experiment purporting to show that the creatine in one of the claimed salts (creatine citrate) when dissolved in water degraded to creatinine less rapidly and to a lesser extent than did the creatine hydrochloride salt mentioned in Almada. (Exh. F, G).

There are several reasons why rejection based on Almada should have been maintained.  *Assuming arguendo* that the results of the Del Corona experiment were indeed unexpected, they were not sufficiently material as a matter of law to overcome the Examiner's prima facie case of obviousness.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007), *citing Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) (even if invention exhibits unexpectedly superior results, such a showing cannot overcome strong showing of obviousness); *McNeil-PCC, Inc. v. Perrigo Co.*, 516 F.Supp. 2d 238, 255 (S.D.N.Y. 2007), aff'd without opinion, 2008 U.S. App. LEXIS 8017 (Fed. Cir. Apr. 14, 2008) (unexpected result of improved stability for

therapeutic compound could not outweigh obviousness of the claimed invention for purpose of masking compound's bitter taste).

Almada teaches that in a preferred embodiment, the creatine derivative will be in powdered form, dissolved in a liquid, and prepared at approximately the time of intended use and consumption by a human patient.  (Exh. I, col. 4, ll. 41-48).  Almada mentions that the creatine derivative would not typically fully dissolve in cold liquids (Exh. I, col. 4, ll. 53-55).  Yet in the Del Corona experiment, at the time of consumption (the initial measuring after the two creatine salt solutions had been prepared), the difference in degradation of just such compositions as described in the Almada patent was reported to be a mere quarter of one percent (0.25 %).  (Exh. F at 3).  After one hour the difference was only 0.29%.  (*Id*.).  Such minute degradation would not be of significant relevance to one seeking to use a pharmaceutical salt of creatine for the therapeutic purposes in question.  (Buynak Decl., ¶ 31; Hamilton Decl., ¶12-13).

Second, the prima facie case for obviousness based on Almada is even stronger than what was considered by the Examiner.  In choosing a pharmaceutically acceptable creatine salt as called for by Almada, one of ordinary skill in the art would desire a salt that was available, safe, and soluble.  As noted, the Almada reference itself raises the issue of the low-solubility of creatine powders dissolved in water.  (Exh. I, col. 4, ll. 53-55).  The Berge reference discussed *supra* would have directed one of ordinary skill in the art to the dicarboxylic salts claimed in the '199 patent, as well as simply providing a list of FDA approved salts which included commonly used salts such as citrates and maleates.[5]

---

[5] The decision in *Pfizer v. Apotex* is also notable in that the Federal Circuit relied in-part on the same Berge reference at issue here, particularly the table of FDA-approved acid salt forms, to hold a patented

**B.  The '287 Patent Is Anticipated or Rendered Obvious By the Use of Amino Acid-Ketoacid Supplements Disclosed in Fitness Periodicals Published Years Before the Earliest Possible Effective Filing Date of the Patent.**

The '287 patent is directed to the use of compounds comprising an amino acid

and a ketoacid for the purpose of increasing muscle performance or reducing muscle

fatigue.  Pursuant to the Court's claim construction order dated June 5, 2008, amino acids

and ketoacids are construed to include their salt forms.

35 U.S.C. § 102 states:

A person shall be entitled to a patent unless

(b) the invention was patented or described in a printed publication in this or a
foreign country or in public use or on sale in this country, more than one year prior to the
date of the application for patent in the United States.

The use of the amino acid / ketoacid compounds claimed by the '287 patent was

widespread among bodybuilders long prior to November 13, 1996 (a year prior to the

earliest date of application which Plaintiffs are permitted to assert for the '287 patent).[6]

Such use was clearly, even starkly, disclosed in legions of popular fitness publications

dating as early as 1993.  Many of the amino acids and ketoacids identified in the '287

patent are explicitly named in advertisements for nutritional supplements used to improve

muscle performance or enhance recovery from fatigue.  The 1995 book "The Anabolic

Diet" by Dr. Mauro Di Pasquale also clearly disclosed the use of the amino acid/ketoacid

---

pharmaceutical salt obvious as a matter of law.  Plaintiff had acquired a patent on the salt amlodipine
besylate, which it had formulated after discovering undesirable properties with its previously patented
amlodipine salt (i.e., amlodipine maleate).  *Pfizer*, 480 F.3d at 1353-54.  There, as here, the prior art
indicated that the claimed acid form for the salt (besylate) would provide superior characteristics.  The
Federal Circuit noted that this evidence of obviousness was bolstered by the list of FDA-approved salts in
Berge, as it was commonplace for formulators to use such a compendium to produce new drug
formulations.  *Id.* at 1363.  The Court further implied that use of the more frequently marketed salts listed
in Berge would be particularly obvious.  *Id.*  This is precisely what occurred in the present case: three of the
salts originally claimed by the inventors of the '199 patent are among the most widely used as disclosed by
Berge.  (Exh. H at 2, Table I).

[6] The '287 patent claims priority to Provisional Application No. 60/065,429, filed November 13, 1997.
BSN disputes that any claim of the '287 patent other than claim 3 is entitled to this date due to lack of
support in the provisional application for the broader claims.  Regardless, all prior art presented in the
present motion was published prior to November 13, 1996).

compounds claimed in the ʹ287 patent.  To the extent some of the minor variations of the

invention presented in the dependent claims of the ʹ287 patent were not explicitly

disclosed in these publications, they involve insignificant variations that would have been

obvious to those of ordinary skill in the art.  Only claim 3 (which requires the specific

amino acid glycine to be present in the compound) requires a combination of references

to establish invalidity for obviousness under 35 U.S.C. § 103.[7]

The following chart summarizes which elements specifically identified in the ʹ287

patent appear in the prior art references submitted in this motion.[8]

---

[7] The parties currently dispute which "ten claims" are at issue in the current action.  Plaintiffs have
unilaterally chosen 10 claims on the condition that Defendants drop their declaratory judgment of invalidity
counterclaims for the remaining claims.  For purposes of this motion, BSN only seeks to invalidate
Plaintiffs' asserted claims.  *Dkt. No.* 173.
[8] Each of the compounds identified in the charted references are consumed orally (claim 9) and
administered to a human subject (claim 18).

| Claim #<br>Element<br><br><br>Reference | 1<br>Ketoacid | 1<br>Cationic or dibasic amino acid | 2<br>Glutamate, glutamine, or glycine | 5<br>Ketoiso-caproate (KIC) | 7<br>Arginine | 8<br>Conjuga-ted amino acid and ketoacid | 10<br>Low calorie beverage | 12<br>Cap-sule |
|---|---|---|---|---|---|---|---|---|
| 1 (Mass Fuel) | ✓<br>Alpha-ketoglutarate; Ketoisocapr-oate | ✓<br>Ornithine | ✓<br>Glutamine | ✓ | | ✓<br>OKG | | |
| 2 (Professio-nal Protein) | ✓<br>Alpha-ketoisocapr-oic acid | ✓<br>Ornithine; Arginine | ✓<br>Glutamine | ✓ | ✓ | ✓<br>OKG | | |
| 3 (Hot Stuff Double X) | ✓<br>Alpha-ketoglutarate | ✓<br>Ornithine; Arginine pyroglutam-ate | | | ✓ | ✓<br>OKG | | |
| 4A (Anti-Catabolic Fuel) | ✓<br>Ketoisocap-roate | ✓<br>Ornithine | ✓<br>Glutamine | ✓ | | ✓<br>OKG | | ✓ |
| 4B (Performa-nce OKG) | ✓<br>Alpha-ketoglutarate | ✓<br>Ornithine | | | | ✓<br>OKG | | ✓ |
| 5 (õThe Anabolic Dietö) Formula 1 | ✓<br>Alphta-ketoglutarate; Ketoisocapr-oate | ✓<br>Ornithine; Arginine | ✓<br>Glutamine | ✓ | | ✓<br>OKG | ✓ | |
| 5 (õThe Anabolic Dietö) Formula 3 | ✓<br>Alpha-ketoglutarate; Ketoisocapr-oate | ✓<br>Ornithine; Arginine | ✓<br>Glutamine | ✓ | ✓ | ✓<br>OKG | ✓ | |

## 1. The June 1995 Advertisement for TwinLab Mass Fuel Anticipates Claims 1, 2, 5, 8, 9, and 18.

The June 1995 issue of Flex Magazine includes an advertisement for a nutritional supplement named õMass Fuel.ö  (Earnest Decl., ¶ 16; Exh. Q at 107).  The advertisement stated that Mass Fuel included the following ingredients:

-   L-Ornithine Alpha-ketoglutarate

-   Ketoisocaproate acid (KIC)

-   L-Glutamine

-   L-Carnitine

16

*Id.* The advertisement states that the supplement had helped top professional athletes õgain size, strength and a real competitive edge.ö  *Id.* The advertisement further teaches that using the supplement promotes õmuscle synthesis and growth,ö and that research indicated that the supplement prevents muscle breakdown during workouts and speeds muscle recovery afterwards.  *Id.*

Claim 1 of the ¢287 patent recites:

õA method for enhancing muscle performance or recovery from fatigue wherein said method comprises administering a composition comprising a ketoacid and an amino acid wherein said amino acid is cationic or dibasic.ö  (Exh. P, col. 16, ll. 61-64).

Every element of the method claimed in claim 1 is found in the Mass Fuel advertisement.  It is undisputed that ornithine is an amino acid which is õcationic or dibasicö and that alpha-ketoglutarate and ketoisocaproic acid are ketoacids.  Increase in muscle strength is by definition an enhancement in muscle performance, and accelerated muscle recovery is synonymous with recovery from muscle fatigue.  (Earnest Decl., ¶¶ 14, 22, 24, 35, 51, 55; Exh. P, col. 16, ll. 1-4).

Anticipation of other claims is just as readily apparent.  The only additional limitation in claim 2 of the ¢287 patent is that the compound include either glutamate, glutamine or glycine.  (Exh. P, col. 16, ll. 61-67).  Mass Fuel contains glutamine.

Claim 5 is specifically limited to a-ketoisocaproic acid and thus is also anticipated.  (Exh. P, col. 17, ll. 8-9; Earnest Decl., ¶¶ 16, 18, 20-25).

Claim 8 is a dependent claim of claim 1, with the limitation that the amino acid and ketoacid are conjugated.  (Ex. P, col. 17, ll. 15-16).  The ingredient ornithine alpha-ketoglutarate is just such a conjugate compound.  (Earnest Decl., ¶¶ 13, 19).  In fact, the similar ingredient arginine alpha-ketoglutarate has been identified by Plaintiffs as

17

infringing this claim in conjunction with BSN product advertising similar to the advertisements presented in this motion.  (Exh. W at 18, discussion of claim 8).  A maxim of patent law states that which literally infringes if later in time anticipates if earlier. *Schering Corp. v.Geneva Pharms., Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003).

Claim 9 is a dependent claim of claim 1, with the limitation that the compound is administered orally.  (Exh. P, col. 17, ll. 17-18).  Mass Fuel is administered orally, as indicated in the advertisement that it may be mixed with water.  (Earnest Decl., ¶ 20).

Claim 18 is a dependent claim of claim 1, with the limitation that the method is to be used on a human.  (Exh. P, col. 18, ll. 16-17).  Though probably self-evident, the advertisement features testimonials from actual human users.  (Earnest Decl., ¶ 20).

Accordingly, this reference anticipates claims 1, 2, 5 and 8 of the ¢287 patent. (Earnest Decl., ¶¶ 16-25).

**2.  The June 1996 Advertisement in Flex Magazine for Weider Professional Protein Anticipates Claims 1, 2, 5, 7, 8, 9, and 18.**

Weider Professional Protein is a supplement similar to Mass Fuel, with the important distinction that it includes the amino acid arginine as well as ornithine, thus additionally anticipating claim 7.  An advertisement for Professional Protein in the June 1996 issue of Flex Magazine states that the product contains the following ingredients:

-   Arginine Asparate

-   Ornithine Alpha-Ketoglutarate

-   Alpha-Ketoisocaproic (KIC) Acid

-   Carnosine

-   Glutamine (identified as an ingredient on p. 140, ¶ 4)

(Exh. R at 139-140).

The advertisement provides testimonials from users that the supplement "helps me recuperate faster from my workouts" (Lou Ferrigno), "my recuperation is better, and I feel better after severe workouts" (Mike Francois), "I use it before training and feel better during my workout" (Rich Gaspari), and "I was able to train harder and more often" (Charles Clairmonte).  (*Id*. at 138-139).

Accordingly, the advertisement teaches the use of Professional Protein for enhancing muscle performance and recovery from fatigue.  (Earnest Decl., ¶¶ 27-30). Professional Protein contains the same ornithine alpha-ketoglutarate and ketoisocaproic acid (KIC) ingredients as Mass Fuel, thus invalidating claims 1, 2, 5, 8, 9, and 18 using the same analysis as discussed *supra*.  (Earnest Decl., ¶¶ 26-32).  The advertisement also invalidates claim 7.  (*Id*. at ¶ 31).  Claim 7 is a dependent claim of claim 1 with the limitation that the composition contains arginine, one of the ingredients in Professional Protein.  (Exh. P, col. 17, ll. 13-14).

**3.  The January 1995 Flex Magazine Advertisements for National Health Products "Hot Stuff Double X" Anticipate Claims 1, 7, 8, 9 and 18 and Render Claim 10 and 12 Invalid as Obvious.**

The "Hot Stuff Double X" supplement includes over 20 ingredients, including the ingredients:

- OKG

- Arginine Pyroglutamate

- Creatine

(Exh. S at 213-214).

The advertisement states that use of the supplement for 30 days results in:

- 8 to 14% increase in strength levels

- 3 to 5 pounds increase in muscle mass

-   "dramatic increase in recuperation power"

-   Up to three hours of sustained workout energy.

(*Id*. at 177, 214).

Accordingly, the Hot Stuff Double X advertisements teach the use of an amino-acid (cationic or dibasic) / ketoacid combination for enhancing muscle performance and recovery from fatigue, thus anticipating claim 1.  (Earnest Decl., ¶¶ 33-38).  Arginine is present, thus anticipating claim 7.  (*Id*. at ¶¶ 33, 38).  OKG is a conjugated compound, thus anticipating claim 8.  (*Id*. at ¶¶ 33, 38).  The substance is administered orally, thus anticipating claim 9.  (*Id*. at ¶¶ 37-38).  The substance is to be used on a human subject, thus anticipating claim 18.  (*Id*. at ¶¶ 37-38).

**4.   The February 1994 Advertisement in Flex Magazine for TwinLab Anti-Catabolic Fuel Anticipates Claims 1, 2, 5, 8, 9, 12,  and 18 and Renders Claim 10 Invalid As Obvious; The November 1993 Advertisement in Flex Magazine for Weider Performance OKG Anticipates Claims 1, 8, 9, 12 and 18 and Renders Claim 10 Invalid As Obvious.**

These supplements differ from those discussed above mainly in that they were amino acid / ketoacid compositions which were provided in capsule form.  Accordingly, they directly meet the additional limitation presented in claim 12 of the '287 patent.  Additionally, as these substances are free from the protein content of the powders discussed above, it is readily apparent that one of ordinary skill in the art could prepare a low calorie composition from their contents.  (Earnest Decl., at ¶¶ 43, 58).  Indeed, a user could easily open the capsule to dissolve the contents in water and consume the composition as a low calorie beverage.

In other respects the anticipation analysis parallels that discussed thus far.  The February 1994 advertisement for TwinLab Anti-Catabolic fuel describes this and other supplements in the advertisement collectively as "Performance Enhancer Capsules"

20

which provide more power, more strength and more endurance and "enhance performance from the inside out." (Exh. T at "back cover").  The November 1993 advertisement for Weider Performance OKG also presents the supplement in a product line that claims to provide the ability to complete one more set or repetition (e.g., of a weightlifting exercise) and specifically with respect to Performance OKG that a user is "cranking it out" with the supplement.  (Exh. U at 84-85).  TwinLab Anti-Catabolic Fuel is described as containing L-ornithine alpha-ketoglutarate, L-glutamine, and ketoisocaproate.  (Exh. T at "back cover").  Accordingly, the advertisement anticipates claims 1, 2, 5, 8, 9, 12 and 18.  (Earnest Decl., ¶¶ 39-43).  Weider Performance OKG is presumed to contain no other active ingredients and thus anticipates claims 1, 8, 9, 12 and 18.  (Earnest Decl., ¶¶ 44-49).

### 5. The Di Pasquale Reference Anticipates Claims 1, 2, 5, 7, 8, 9, 10, and 18 and Renders Claim 12 Invalid as Obvious.

The book "The Anabolic Diet" by Dr. Mauro Di Pasquale was published in 1995 and disclosed a diet regimen for "the natural athlete who wants to be the best that he can be naturally" by optimizing the human body's muscle building mechanism.  (Exh. V at 3-7).  Dr. Di Pasquale recommends that users take several "formulas" before, during, or after workouts "to increase muscle mass and strength by increasing protein synthesis and decreasing protein catabolism." (*Id.* at 56-57).

Dr. Di Pasquale's "Formula 1" is titled "the Anticatabolic-Anabolic Compound" and is comprised of OKG (ornithine alpha-ketogluterate), KIC (ketoisocaproate), glutamine and leucine.  (*Id*. at 57).  The formula is to be taken just prior to training and to be sipped in water continuously during a workout.  (*Id*. at 57).  Glutamine is described as essential for building muscle and decreasing muscle breakdown, sparing muscle tissue

and other amino acids that might otherwise be used for glutamine production.  (*Id*. at 57-58).  The other ingredients are described as stimulating protein synthesis and inhibiting muscle breakdown.  (*Id*. at 57).

õFormula 3ö is labeled õThe "Insulin Anabolizerø Compound.ö  (*Id*. at 58).  It consists of KIC, OKG, arginine, glutamine, and other ingredients.  (*Id*. at 58).  The stated goal of the formula is õto increase and maximize the anabolic, muscle building effects of insulin and growth hormone after the workout and during rest.ö  (*Id*. at 58).  Users are instructed to take the formula immediately after a workout and before bedtime.  (*Id*. at 59).  Dr. Di Pasquale again notes that glutamine leads to decreased muscle breakdown and increased levels of muscle protein, while arginine helps õstimulate and maximize the anabolic effects of both insulin and growth hormone.ö  (*Id*. at 58).

The use of the formulas as discussed by Dr. Di Pasquale clearly anticipates all of the currently asserted claims of the ø287 patent with the exception of claim 12 (which requires the composition be taken in capsule form).  (Earnest Decl., ¶¶ 50-56).  The supplements are directed to be used for the purpose of increasing muscle performance or recovery from fatigue.  Both supplements contain an amino acid and ketoacid with the amino acid capable of being cationic or dibasic and the two acids in conjugated form (OKG), ketoisocaproic acid (KIC), glutamine, are to be taken orally, and are to be used on a human.  Arginine, required by claim 7, is found in Formula 3.

As to claim 12, the preparation of compounds such as the Di Pasquale formulas in capsule form was well known to those of ordinary skill in the art and an obvious variation to use for the consumption of such compounds.  (Earnest Decl., ¶ 57).  Accordingly, claim 12 of the ø287 patent is invalid as obvious.

**6.  Claims 10 and 12 of the '287 Patent Are Invalid As Obvious Because the Administration of Ornithine Alpha-Ketoglutarate (or Any Other Compound Disclosed in the Above References and Claimed in the '287 Patent) In a Low-Calorie Beverage or In Capsule Form Was Well Known as of November 13, 1996.**

To the extent claims 10 and 12 are not anticipated by the aforementioned publications, they are invalid as obvious.  It has long been a trivial matter for one of ordinary skill in the art to prepare a nutritional supplement in a low calorie liquid such as water or to formulate nutritional supplements as capsules.  (Earnest Decl., ¶ 58).  Several of the aforementioned references disclose the use of supplements as capsules (e.g., TwinLab Anti-Catabolic Fuel, Exh. T) and the preparation of the supplement in water (e.g., Dr. Di Pasquale's formulas or TwinLab Mass Fuel, Exh. V and Q).  Though inconceivable that one of ordinary skill in the art would need to combine these references to reach the respective limitations of claims 10 and 12 (i.e., not possess such knowledge him or herself), such a combination would be obvious to anyone seeking to deliver the claimed supplement in low-calorie or easy-to-swallow form.  (Earnest Decl., ¶¶ 57-58).

**7.  The Asserted Claims of the '287 Patent Are Invalid As Obvious Because The Prior Art Publications Suggest the Use of the Claimed Compounds for The Claimed Purposes.**

The anticipation of the '287 patent is readily apparent from even a cursory review of the aforementioned publications.  However to the extent that any of the claims at issue are not found to be anticipated, the invention of the '287 patent would have been obvious to those of ordinary skill in the art in light of the publications.  The references presented clearly disclose the use of the ingredients identified and described in the '287 patent for the benefit of bodybuilders and athletes, thus making formulations attractive to formulators of nutritional supplements in this area.  (Earnest Decl., ¶ 59).

23

**Conclusion**

For the foregoing reasons, BSN respectfully requests that the Court enter

summary judgment that claim 1 of the ø199 is invalid as obvious under 35 U.S.C. § 103

and that the asserted claims of the ø287 patent are invalid as anticipated under 35 U.S.C.

§ 102(b) or, in the alternative, obvious under 35 U.S.C. § 103.


Dated: July 10, 2008                              Respectfully submitted,


                                                  /s/ J. Thad Heartfield
                                                  Rakesh M. Amin (pro hac vice)
                                                  William J. Hallihan (pro hac vice)
                                                  Paul L. Brown (pro hac vice)
                                                  Jonathan J. Krit (pro hac vice)
                                                  Brian M. Wishnow (pro hac vice)
                                                  Amin Hallihan LLC
                                                  444 N. Orleans Street, Suite 400
                                                  Chicago, IL 60654
                                                  Telephone:  (312) 466-1033
                                                  Facsimile:  (312) 223- 1515

                                                  J. Thad Heartfield (Bar No. 09346800)
                                                  THE HEARTFIELD LAW FIRM
                                                  2195 Dowlen Road
                                                  Beaumont, Texas 77706
                                                  Telephone: (409) 866-3318
                                                  Facsimile: (409) 866-5789
                                                  thad@jth-law.com


## CERTIFICATE OF SERVICE

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via the Courtøs CM/ECF system per Local Rule CV-5(a)(3) on this the 10th day of July, 2008.  Any other counsel of record will be served by first class mail.


                                                  /s/ J. Thad Heartfield
                                                  J. Thad Heartfield